175 N.J. Super. 263 (1980)
418 A.2d 278
WILLIAM EDEN, PLAINTIFF-APPELLANT,
v.
CONRAIL AND ROBERT DORRMAN, DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued May 28, 1980.
Decided July 18, 1980.
*267 Before Judges FRITZ, KOLE and LANE.
Sanford E. Chernin argued the cause for appellant (Chernin & Freeman, attorneys).
John VR. Strong, Jr. argued the cause for respondents (Strong & Strong, attorneys).
The opinion of the court was delivered by FRITZ, P.J.A.D.
Plaintiff was struck by a train owned by defendant Conrail and operated by that defendant through its engineer, defendant Dorrman. At the trial of his negligence action against these defendants the complaint against Conrail was dismissed at the end of plaintiff's case on the theory that the railroad was insulated from liability by N.J.S.A. 48:12-152. A jury found Dorrman not negligent. Plaintiff's motion for new trial was denied. Plaintiff appeals. Concerned over a congeries of trial events of questionable propriety, we are persuaded that respect for the interests of justice requires reversal. For reasons which shall appear, we lack conviction that those interests have been properly served. Put another way, we are satisfied that legal errors are manifest that might individually not be of such magnitude to require reversal but which, considered in their aggregate, have caused plaintiff to receive less than a fair trial. Biruk v. Wilson, 50 N.J. 253, 262-263 (1967); State v. Orecchio, 16 N.J. 125, 129 (1954); State v. Zwillman, 112 N.J. Super. 6, 22 (App.Div. 1970), certif. den. 57 N.J. 603 (1971). Additionally, two more objective considerations provide justification for reversal: (1) a substantial, uncorrectable deficiency in the record and (2) our view respecting N.J.S.A. 48:12-152 which differs from that of the trial judge.
Despite some petty bickering at trial  of which there was more than a little  one fact is not in dispute. As plaintiff was scrambling to get off the tracks and back on to the platform of the Paterson station, he was struck by a train owned by Conrail and operated by Dorrman. There is hardly any more dispute about the basic or evidentiary facts if for no other reason than *268 that there is no one to contradict the reports of the respective parties. Of course, application of the law to the facts is that which produces the difficulty and, in large measure, the division of opinion here.
Plaintiff was on the train station platform, which extends for something more than 1,000 feet between the single eastbound and westbound tracks where they cross above Market Street in Paterson. He was waiting to board a train. The platform is only very slightly above the rails, a matter of inches. While thus occupied he lost consciousness. His next recollection is "being on my back and being taken away." He did not deny an awareness that white lines drawn on the platform parallel to the tracks and several feet from the edge of the platform and the adjacent track were designed to inhibit those waiting from nearing the platform edge. But the whole thrust of his undisputed testimony, and the theory of his cause of action, was that his being beyond those lines and on the track was not at all a matter of volition but unintended, involuntary and unforeseen. Plaintiff, born in 1948, had a history of epileptic seizures from the time he was eight years of age. The vast majority of these were of the petit mal variety and entirely manageable. On occasion, however, these were of the grand mal kind and resulted in loss of consciousness and, of course, loss of will. The last of these prior to the date of the accident in question occurred some several years before while he was on a train.
Plaintiff does not  indeed, he could not  deny that he was where he should not be: on the corporate defendant's railroad tracks. But he asks the factfinders to draw the readily available inference that this was because he suffered a debilitating grand mal seizure rendering him unconscious and producing a falling upon or rolling onto the track which not only was not volitional but was entirely beyond his control.
Defendants cannot refute these facts. Only one other person was on the platform at the time of the accident and she did not see plaintiff until she noticed him prostrate upon the tracks. From where this witness stood she thought the object on the track was inanimate. She did not look at it long, idly speculating, *269 "I just looked at it and wondered what was going to happen when the train came in, to see whether it was going to squash it or what was going to happen to it." This observation preceded the arrival of the train by ten minutes.
Without respect for the moment for the statutory defense asserted by the corporate defendant, we record that defendants' assertions of fact were designed simply to prove reasonable and customary care. In the course of this Dorrman conceded that he could see the station and platform at a distance of 600 to 900 feet from the station and that at about 300 feet from the platform he saw "what appeared to be a large cardboard sign or cardboard box," light brown in appearance. At that time the train was moving at about 30 miles an hour or 45 feet a second on a slight downhill grade. Nothing was then done to reduce the speed of the train, but the engineer "turned the bell on and I reached up and I gave one blast of the horn."[1] No claim is made by either Dorrman or his fireman who also testified that anything further was done respecting the operation of the train until the engine was within 50 to 30 feet of plaintiff's recumbent form. Then, at "approximately 30 feet," Dorrman blew the whistle. What happened next is graphically reported in the engineer's testimony on direct examination:
Q. Well, after you blew the whistle, what did you observe then?
A. Well, after I blew the whistle, I noticed a movement from this, what I thought was a cardboard or cardboard box. Then I looked down and I seen a head rise up. Then I realized it was a person on the track.
Q. Now, when you blew the whistle and you saw the movement, what did you do after that?
A. I applied the brakes.
Dorrman had testified that he "maintained" his 30 mile an hour speed until the engine reached the nearest end of the Paterson station. The colloquy quoted above was speaking to events which happened after the train entered the station.
*270 It is clear from the frank and consistent testimony of both Dorrman and his fireman that after the initial brief observation of the object on the track, which both thought to be a box, neither looked at it again until the whistle blew. By then, as Dorrman admitted, it was "[a]bsolutely impossible" to "stop that train before striking the body."
As noted above, we are troubled at the outset by a serious, irremediable procedural defect in the record before us. After the jury had been deliberating for about two hours it sent out two questions. As to one of these the following appears from the transcript:
THE COURT: ... I am going to address myself to question two first.[2]
It reads as follows: "In his testimony, did Mr. Eden state that he crossed the white safety lines? If so, how close to the track did he go?"
There was direct testimony by Mr. Eden and there was cross-examination of Mr. Eden. The reporter sitting closest to you took the direct. He has gone through his notes at my direction and he is going to read to you the pertinent question which relates to that and the response.
He will then be followed by the young lady sitting over here who took the cross-examination on Monday. I have gone through with her in my chambers, the pertinent section, as I believe it to be pertinent, of the transcript.
They will then read to you the questions and answers which would lead to the same general subject matter.
Mr. Senders, if you will turn and face the jury, please? If you will read to them what I have designated to be the appropriate questions and answers on this question number two.
(Whereupon, previous testimony read by court reporters.)
THE COURT: Ladies and gentlemen, I have had reread to you what I consider to be all of the testimony by Mr. Eden, direct and cross, with reference to the white lines and the crossing of the same.
By our leave, the attorney for plaintiff moved for summary disposition (R. 2:8-3(b)) on the basis of a certification which included the following:
6. After the jury retired they presented two questions to the judge as to which they sought answers. A photocopy of the actual questions submitted by the jury is attached hereto.
7. Without advising the attorneys for either plaintiff or defendant was [sic] to what its intentions were, the Court recalled the jury before it and instructed *271 two Superior Court reporters to reread various portions of the testimony in an attempt to provide the answers to these questions.
8. When I obtained the transcript of these proceedings which occurred on June 13, 1979, I noted at page 32 thereof the following paragraphic insert: "Whereupon, previous testimony read by court reporters". What, in fact, was actually read nowhere appears in the transcript.
9. I attempted to obtain copies of the court reporter's notes in order to find out what actually was read and omitted from the transcript. The court reporter has advised that he has only been able to identify two specific questions and their answers even though much more was reread. I have also written to the trial judge in hopes that his notes would reflect the identification of these portions of the testimony which he caused to be read to the jury and which was omitted from the transcript. The judge's notes did not contain that information. I am attaching hereto a copy of a reply from the trial judge.
10. The two questions presented by the jury go to the heart of the case surrounding the negligence of both the plaintiff and the defendant. The procedure employed by the trial court, its reading of limited portions of testimony and its supplemental charge to the jury were objected to by both attorney for plaintiff and attorney for defendant. These objections and the procedures employed form a substantial basis for the appeal now pending before this court.
11. Without the essential testimony which was reread by the trial court, the appellate court, will have no way of knowing whether such conduct or rereading was prejudicial to the case of the plaintiff and no proper decision can be made without it. The omitted portions of the testimony reread are essential to the appeal presented by plaintiff.
In a responsive certification counsel for defendants asserted an "independent recollection of the testimony read to the jury." Neither the trial judge nor the reporters were that certain. By letter, the trial judge advised counsel for plaintiff on his post-judgment inquiry:
I have checked the file in the Clerk's office and my personal notes of the trial. Neither reflects precisely nor itemizes those portions of the testimony which I instructed the reporters to read back (reread) to the jury. I have no recollection of the precise portions of the transcript which were, in fact, reread. I assumed, as I always have, that this is a matter which is contained in the verbatim transcript of the record.
The reporters advised of their ability to "approximate the testimony" that was read but qualified even that with the following:
I would like to emphasize that this representation that we are making has been determined both from our recollections of the request that was made to us and any indications we might have on our stenographic notes. This is not meant to be a certification of the exact testimony that was read back to the jury on June 13, 1979.
*272 This case is exquisitely close. The issues are important not only to the litigants but as matters of recurring procedural and substantive jurisprudence. In such a situation we are reluctant to address ourselves to a record concededly incomplete. If our concern were with no other point raised by appellant than that charging the verdict to be contrary to the weight of the evidence, we would even then be jousting with a question which is unanswerable on this record: How much was the verdict affected by the rereading of selected testimony, or, indeed, by the omission to reread other selected testimony relevant to the questioned issue? The "crucial importance" of a "complete transcript" is unmistakable. State v. Green, 129 N.J. Super. 157, 166 (App.Div. 1974). Accord: Hardy v. United States, 375 U.S. 277, 84 S.Ct. 424, 11 L.Ed.2d 331 (1964), motion for reh. den. 376 U.S. 936, 84 S.Ct. 790, 11 L.Ed.2d 657 (1964). Abridgement of the transcript in the trial court is not proper even by intention and stipulation. McCann v. Biss, 65 N.J. 301, 304, n. 2 (1974).
It is noteworthy that at the end of the reading and the supplemental charge, counsel for plaintiff voiced an objection. After expressing his frustrated hope that "the Court might have had the benefit of input by counsel prior to making the decision" regarding answers to the jurors' questions, he recorded "collateral problems," including this one.
... I have not had time to review my notes to determine whether or not the portions read by both stenographers contain the totality of the evidence or the testimony relating to the white line and the possibility of crossing over or the proximity to it. I have no way of responding to the Court as of this moment.
Since we have concluded that other considerations require reversal, we need not determine whether this obvious impropriety alone would suffice. Certainly it adds to the accumulation of troublesome events mandating reversal and remand. The problem also serves to remind trial judges and court reporters of the necessity for care and foresight in the establishment of the record.
We are persuaded that dismissal of plaintiff's cause of action against the corporate defendant at the end of plaintiff's case was error. The dismissal was predicated wholly on application of N.J.S.A. 48:12-152. In its entirety that statute reads:

*273 Trespassing on tracks prohibited; contributory negligence; injury on tracks or moving car; crossings
It shall not be lawful for any person other than those connected with or employed upon the railroad to walk along the tracks of any railroad except when the same shall be laid upon a public highway.
Any person injured by an engine or car while walking, standing or playing on a railroad or by jumping on or off a car while in motion shall be deemed to have contributed to the injury sustained and shall not recover therefor any damages from the company owning or operating the railroad. This section shall not apply to the crossing of a railroad by a person at any lawful public or private crossing.
There is an immense temptation to observe that plaintiff was not "walking, standing or playing" on the railroad and therefore does not come within its proscription. The position is hardly frivolous in view of the mandate from our Supreme Court that we strictly construe this legislative largesse of immunity from tort liability and take care to see that it is "not extended beyond [the] plain meaning" of the statute. Potter v. Finch & Sons, 76 N.J. 499, 502 (1978). However, we resist this temptation as too simplistic and commence a necessary search for the intent of the Legislature in the enactment. This should not be deemed an indication that we find no significance in the fact that the Legislature limited its injunction to the intentional choice of these particular acts without elaboration. Quite the contrary. It appears to us that this choice reflects an intention not to punish all who, regardless of circumstance, are injured on railroad tracks. Rather the design seems to be the only other alternative: to deter those who exercise wrong judgment in making a conscious decision as to whether they will enter upon the railroad or refrain from that trespass.
At least one prior decision of ours holds that not everyone upon railroad tracks without authorization comes within the purview of the statute. In Demetro v. Penna. R.R., 90 N.J. Super. 308 (App.Div. 1966), we held that one who rushed upon the tracks to save the lives of three small children and was herself killed did not. The entry there was volitional.
The statute and our cases emphasize that the forbidden conduct is that of trespass. The title employed on the statute recognizes this intent, and the aim at the wrong of trespass *274 regardless of the age of the trespasser is recognized in Egan v. Erie R. Co., 29 N.J. 243 (1959). The absolute bar of the statute is from a "liability to trespassers." Potter v. Finch & Sons, 76 N.J. 499, 503 (1978).
A trespasser has been defined with respect to actions in negligence as "one who intentionally and without consent or privilege enters another's property." Kight v. Bowman, 25 Md. App. 225, 333 A.2d 346, 350 (Ct.Sp.App., 1975) (emphasis supplied). We are satisfied that it is against this evil of intentional entry the statute in question was designed.
Uninvited entry upon the railroad tracks is conclusively wrong to the extent of justifying a dismissal at the end of plaintiff's case in the circumstances before us, if at all, only by virtue of the statute. Affirmance here would require a construction of that statute implying a holding that no matter what a plaintiff was doing upon the track (even if it were not walking, standing, playing or jumping) and no matter that he was there against his will, the railroad company was irrevocably relieved from liability. We do not think the Legislature meant that. If they had they would have been either more generous in their description of the proscribed activities or more exact in their expression of this absolute immunity. Nor have we been offered any law in New Jersey or elsewhere that supports such construction.
With regard to our convictions in this direction we are entitled to assume that the Legislature did not intend to fashion an immunity one whit broader than that specifically detailed. That assumption is based upon the further assumption that the Legislature is mindful that immunity from liability for the negligent infliction of injury upon others is not favored in the law since it leaves unredressed injury and loss resulting from wrongful conduct. Harrison v. Middlesex Water Co., 80 N.J. 391, 401 (1979).
There is no evidence at all here that plaintiff was intentionally upon the tracks. He says he was not, and no evidence refutes that. There is evidence from which a jury might reasonably find that he was there quite unintentionally as the result of *275 a fall consequent upon an epileptic attack. In such case N.J.S.A. 48:12-152 is not fatal to his action.
We do not think that the statement in Barcolini v. Atlantic City & S.R.R. Co., 82 N.J.L. 107 (Sup.Ct. 1911), ostensibly precluding recovery on the basis of the statute by "all persons alike, without distinction as to their age or physical or mental condition" (at 108), compels a different result or that we do violence to that holding. That case involved a 21-month-old child who had "strayed" upon the private right of way of the railroad. The fact remains that that infant had entered upon the tracks of her own volition. While it might be argued that her immature judgment was bad as a result of age or mental condition, it was in any event the exercise of conscious will. The same cannot be said for Eden. We do not believe that had Eden been assaulted while on the platform, rendered unconscious and dumped upon the tracks, there to remain in a coma, the statute would have required a dismissal of his action against the railroad. We see no more reason for a different result where the causation is a physical seizure that overrides the will.
An argument might be made that since the jury found no negligence on the part of Dorrman and since the only liability of the corporate defendant would be for negligence imputed to it because of the acts of its agent engineer, the error was harmless in any event. We think not. Reference need only be made to the dissent of Justice Pashman in Potter v. Finch & Sons, supra, 76 N.J. 504 at 509, to recognize that without the availability of recourse to a corporate defendant a jury might easily  most probably would  say, as did Justice Pashman, "These individuals [here, Dorrman] may eventually lose their homes in satisfaction of a judgment awarding substantial damages to plaintiff, while their employer remains untouchable."[3] We recognize that the jury would face the same dilemma if, in the conscientious *276 exercise of its duty, it should for some reason find the engineer negligent but not the railroad. Concern for this does not cause us to believe that the wrongful absence from the jury room of the action against the corporate defendant was of no consequence or insignificant. We are not persuaded that this did not intrude upon the fairness of plaintiff's trial.
In view of the necessity for a new trial, we feel constrained to comment on the duty of care of the railroad in such circumstances, as did the court in Demetro v. Penna. R.R., supra, 90 N.J. Super. at 310. Our Supreme Court has held that adherence to three traditional classifications of invitee, licensee or trespasser is desirable for the sake of predictability. Snyder v. I. Jay Realty Co., 30 N.J. 303, 311-312 (1959). We are bound by that holding, In re Education Ass'n of Passaic, 117 N.J. Super. 255, 261 (App.Div. 1971), certif. den. 60 N.J. 198 (1972), although we think that the peculiar circumstances here should enable the addition of a new class or subclass with new responsibilities. Therefore we must determine which category most closely fits Eden. In a case such as the one before us, in which the entry was unintentional and against the will of plaintiff, we believe the implication of Demetro, in which the entry was volitional regardless of the nobility of purpose, and the express direction therein that the precautions owed do not rise to those owed to a licensee, should not prevail. We think that in the situation where a railroad fails to guard its platforms, by persons, mechanical device, physical barrier or other reasonable means, from the risk of grievous bodily harm inherent in the possibility of wholly unintentional intrusion upon the right of way, its duty should be at least that owed to a licensee, as one whose presence is suffered by virtue of the failure of the railroad to do anything (beyond the rather passive painting of white lines) to prevent it. See Imre v. Riegel Paper Corp., 24 N.J. 438, 446 (1957). The desirable policy inherent in such a rule of law creating a basis for liability to this class, called "tolerated intruders" by Dean Prosser, "would seem to be only the ordinary duty to protect another, where the harm to be anticipated from a risk for which the defendant is responsible [under circumstances such as those *277 present here] outweighs the inconvenience of guarding against it." Prosser, Law of Torts (4 ed. 1971), § 58 at 361. The words of Justice Heher, although in a different factual application, are here appropriate:
... In the choice of competing considerations of societal policy, the need for protection against the reasonably foreseeable risk of death or severe personal injury outweighs the freedom of action that would otherwise characterize the relation of the possessor of land to a trespasser. Death or serious injury is too great a price to pay for a mere trespass, so circumstanced. [Imre v. Riegel Paper Corp., supra, 24 N.J. at 448-449.]
There is no necessity in this case to extend this duty beyond the station and its platforms.
The ordinary duty to a licensee is merely restraint from willfully injurious acts. Snyder v. I. Jay Realty Co., supra, 30 N.J. at 316. A recognized exception to this general rule is that where there is a known dangerous condition on the premises which the occupier could reasonably anticipate that his licensee would not observe and avoid, he must either give warning or make the condition reasonably safe. Ibid. We believe the factual situation inherent in the railroad platform qualifies for application of the exceptional rule. We are of the opinion that the jury here should have the opportunity to determine whether the white lines (or any other relevant evidence of forewarning or safety devices defendants may produce on the retrial) satisfied defendants' duty (1) to warn Eden of the increased hazard to those unintentionally upon the track produced by the inability to stop or unlikelihood of trains stopping before harm to the person becomes inevitable or (2) to make such condition reasonably safe for the protected class. It may well be that the white lines are all that could reasonably be expected in this particular station. But we think this is the kind of question which should be referred to the jury for solution.
Having determined that N.J.S.A. 48:12-152 is not applicable, there is no need for us to wrestle with the question presented in plaintiff's brief as to whether that statute was impliedly repealed by the passage of the Comparative Negligence Act, N.J.S.A. 2A:15-5.1. See the comment of Justice Pashman in his dissent in Potter v. Finch & Sons, supra, 76 N.J. 504 at 509-510.
*278 We are also uncomfortable respecting the charge to the jury. Laying aside for the moment two particular areas of concern (i.e., the failure of the trial judge to tailor the charge to the particular facts of this rather extraordinary case and use of the word "trespasser" in the charge), we observe that the charge, read in its entirety, might be thought to inform the jury respecting Dorrman's duty to Eden. Ordinarily in this event deficiencies in the charge will not support a reversal. State v. Freeman, 64 N.J. 66, 69 (1973). But as noted throughout this opinion and as is readily apparent from the facts, this is not the ordinary case. In this type case the judge has an added burden of assuring that the charge, an essential to the doing of justice, is unmistakably clear. The clarity of the statement to the jury is a conjunctive prerequisite with its correctness. Kaplan v. Haines, 96 N.J. Super. 242, 251 (App.Div. 1967), aff'd o.b. (maj. opin.) 51 N.J. 404 (1968). It is in this regard that we believe the trial judge came up short in this obviously difficult matter. The lack of clarity and the real potential for confusion inherent therein lie principally in the two areas reserved above.
First, the charge respecting the law was wholly divorced from any reference to the facts. While generally a judge may or may not refer to the facts of the case as he sees fit (always making certain of course to reserve to the jury its exclusive right to determine what the facts actually were), in a case such as this interpolation of the testimony seems essential to clarity. A graphic example may be seen in this abstract from the charge:
The railroad engineer is entitled to the presumption of a clear track and is bound to only exercise reasonable and ordinary care to avoid injuring trespassers after he has discovered them to be imperiled.
A jury might well ask many questions in this regard. First, what is the effect of a presumption? Then a telling one: what happens to the presumption when the engineer looks, as here, and sees that the track is not clear, as here? Does the presumption relieve the engineer of any duty to make a further observation when he sees that the track is not clear but believes what is on it is not an "imperiled trespasser"? Each of these inquiries *279 and a myriad of others might well have been answered by an explanation of the existing law in the terms of the testimony. As it was, the jury was required to struggle with "pure" statements of law, hardly any of which could be applied to the essentially uncontradicted factual context without substantial cutting and trimming. We believe that the inevitable confusion denied plaintiff a fair trial.
Beyond this, as plaintiff here complains, the trial judge referred to plaintiff repeatedly as a trespasser and for the most part framed the duty of defendant to plaintiff in terms of the duty of a possessor of land to a trespasser. At the outset we believe that were nothing else to be said in this respect we still would find meritorious plaintiff's lament that nowhere did the trial judge define a trespasser for the jury. As detailed above at length, we hesitate to characterize this plaintiff in these circumstances as a trespasser. An expression describing a duty (or absence thereof) to persons upon the track without authorization would have done as well and would have avoided the perjorative impact of the word "trespasser."
Further, we also believe the duty owed by the engineer was greater than one simply of exercising "reasonable care to avoid injuring a trespasser when the victim is actually discovered in a position of peril." The trial judge here charged:
Now, a railroad and its employees, including an engineer, are not responsible for the safety of a person who trespasses on the railroad track. The railroad and its employees have a right to expect a clear track.
However, the railroad and its employees have a duty to exercise reasonable care to avoid injuring a trespasser when the victim is actually discovered in a position of peril.
Such a charge implies that, regardless of other circumstances, a duty to use reasonable care with respect to a person on railroad tracks without invitation or authorization does not arise until: (1) that person (2) is actually observed to be a potential victim (3) in a position of peril. We think that is not the present law.
Even as to a trespasser the old common law doctrine that an owner of land owed him no duty of care except to refrain from causing injury to such person by willful or wanton conduct *280 has been modified "so as to put the interest of the parties in better balance." Potter v. Finch & Sons, supra, 76 N.J. at 504. Especially with respect to instrumentalities possessing a real potential for grievous bodily harm, the standard of duty is the protection of others against an unreasonable risk of that harm. Imre v. Riegel Paper Corp., supra, 24 N.J. at 444. That principle has for years been applied to the benefit of infant trespassers in cases where the trespass has been discovered or where there was reason to anticipate it. Strang v. South Jersey Broadcasting Co., 9 N.J. 38 (1952). We see no reason why the principle involved, born of prudent and sensible public policy, should not apply to the situation before us. The difference in age between Edward Strang and William Eden might be of some significance respecting attraction to an untended fire. That difference produces no distinction between the young and the older who stand on a train platform two or three feet from a train that cannot be stopped without the initiation of a complex series of mechanical occurrences and who suffer from dysfunctions which on occasion strip them of will.
The Restatement of the Law of Torts supports the principle, if not the express application, we here recognize. 2 Restatement, Torts 2d, § 336 at 190 (1965). Comment b to that section notes,

b. Precautions when possessor's activities highly dangerous. If the activity which a possessor of land carries on upon it is one which, even though carelessly conducted, is likely to cause only some harm which, though substantial, is less than death or serious bodily harm, the possessor is not required to exercise care for a trespasser's safety unless he knows of his presence at some point made dangerous by the activity or unless he sees an object or hears a sound which makes him regard the presence of a trespasser as substantially certain or at the least highly probable. On the other hand, the gravity of the danger threatened by an activity which, unless carefully carried on, is likely to cause death or serious bodily harm, requires the possessor to exercise reasonable care not only when he knows that a trespasser is at some point made dangerous by it, or is reasonably certain or regards it as highly probable that he is at such a point, but also when he sees an object or hears a sound which causes him to realize that there is a substantial chance that the trespasser may be at such a point. This is in accordance with the tendency of the law not only to require a greater amount of care where life and limb are at stake, than where only some minor harm is likely to occur, but also to extend the duty of protection to persons to whom no duty would be owing if a less serious harm were threatened. [Emphasis supplied]
The example which follows that comment is particularly apt:

*281 1. The engineer of the X & Y Railroad Company sees lying upon the track a pile of clothing such as would give a reasonable man cause to suspect that it might contain a human being. Under these circumstances the engineer is not entitled to assume that it is not a human being but is required to keep the engine under control until he is certain that it is not. [Id. at 191-192]
With respect to the operation of the train, the jury should have been charged that in view of the gravity of the danger the engineer has a duty of care commensurate with the foreseeable risk involved as measured in terms of waiting passengers, the configuration of the station, platform and tracks, and any other of the relevant factual circumstances involved at the time and place in question. Conduct departing from that which would be employed by the reasonable engineer in such a situation constitutes actionable negligence.
Since the matter must be retried, we also record our opinion that the trial judge was wide of the mark in his ruling confining the jury in its "use" of defendants' interrogatory answers read to them by plaintiff's counsel "as against that Corporate Defendant," and not with respect to the individual defendant. Both defendants were represented by the same counsel of record. Plaintiff served interrogatories on counsel which were prefaced, "DEMAND IS HEREBY MADE OF THE DEFENDANTS FOR CERTIFIED ANSWERS TO THE FOLLOWING INTERROGATORIES...." Two signature lines were provided with no identification thereunder. Answers were returned under cover of the following letter from counsel for defendants:
Enclosed herewith is original and copy of answers to interrogatories in the above matter.
Kindly acknowledge receipt of same on the enclosed copy of this letter and return same to my attention in the envelope also provided herein.
Certifications will follow as the agent who prepared the answers to the interrogatories neglected to sign same and we are this date forwarding same to him for his signature.
Ultimately a certification page was returned bearing the signature of one Charles Ormiston, not further identified therein or in the letter of transmittal. At trial, counsel for defendants represented that he was "a Claim Agent of Conrail." When counsel for plaintiff moved to be permitted to read the interrogatories *282 to the jury, counsel for defendant objected on behalf of Dorrman on the theory that Dorrman had not personally certified them. That objection was sustained.
Whatever the result might be had plaintiff attempted to confront Dorrman on cross-examination with answers purportedly his, we have no doubt at all that the furnishing of answers by counsel on behalf of both defendants without reservation, as here, constitutes the attorney's representation that they are the responses of both clients. Cf. R. 1:4-8. Otherwise that counsel is in violation of the Rules for having failed properly to respond. In such circumstances fairness and justice dictate that the attorney should be estopped from protesting the lack of certification. The answers should be available at least to be read to the jury, if otherwise admissible, even without certification. In our courts, long discontent with gamesmanship as a substitute for truth-finding and the doing of justice (see State v. Moore, 147 N.J. Super. 47, 51 (App.Div. 1977); Moksvold v. Meyers, 130 N.J. Super. 481, 484-485 (App.Div. 1974); Evid.R. 5), it ill behooves counsel to say, as counsel for defendant says here respecting the deficiency which he himself has created, "... if plaintiff specifically wanted [Dorrman's] signed certification, he had ample opportunity to do so before this matter was tried...."
While on the subject of interrogatories we pause to note plaintiff's further complaint here that he was unduly restricted regarding the number of interrogatories he was permitted to read. It is difficult to know the basis of exclusion by the trial judge of some of the several interrogatories concerning which admission was sought by plaintiff. At first blush it appears that the trial judge, having determined that certain interrogatory answers obviously attributable to Dorrman would not be permitted because he had failed to certify those answers, decided that answers apparently supplied by Dorrman would not be admitted but those which were general enough to represent only the corporate defendant's thinking would be admitted. But even thus measured there seems to be an inconsistency in his exclusion of one question (No. 17) and his admission of two *283 others (Nos. 18 and 20). We presume that in view of our holding above in terms of estoppel, the problem will not recur at the retrial.
We add that the insistent assertion of defense counsel at trial that interrogatories like depositions are "secondary evidence" and are unavailable at all until live testimony is adduced in court if the witness is available is wholly frivolous. As counsel for plaintiff then correctly suggested, there is a difference between witnesses who are parties and those who are not. As to the former both depositions and interrogatories are available to an adverse party for any purpose. R. 4:16-1(b); R. 4:17-8(a). The suggestion of the trial judge that R. 4:16-1(b) may refer only to parties who "have some connection with the corporation" as "officer, director, or managing or authorized agent" is entirely wrong.
Finally, we reject as without merit the argument of plaintiff that the trial judge erred when he refused to remove from jury consideration the issue of plaintiff's negligence. On plaintiff's motion at the end of all the evidence for an order striking "any defense of negligence chargeable to the plaintiff in this case and remov[ing] that issue from the jury," the trial judge said:
... I think that reasonable minds could differ and that reasonable minds could infer that the plaintiff here, given his condition, given his understanding of that condition, given his understanding of certain propensities or attributes of that condition and given his testimony as to his conduct on the platform, given the testimony as to where he was found, given the distances from the white line, and the existence of the white line, might well be found not to exhibit that care for his own safety which he should have. That, in effect, would constitute negligence.
In this we think he was entirely correct.
Reversed and remanded for a new trial against both defendants. We do not retain jurisdiction.
LANE, J.A.D. (dissenting).
The majority holds that N.J.S.A. 48:12-152 was inapplicable to Conrail because plaintiff was on the railroad tracks without volition on his part. I do not believe that it makes any difference *284 whether plaintiff fell on the tracks because of his epileptic condition or whether he volitionally walked on the tracks.
In Egan v. Erie R. Co., 29 N.J. 243 (1959), the court held that a seven-year-old child was barred by the statute. In so holding the Court reaffirmed the decision in Barcolini v. Atlantic City & S.R. Co., 82 N.J.L. 107 (Sup.Ct. 1911). The court stated:
... Our former Supreme Court in denying recovery held that the above quoted statute is "a bar to recovery by any person who walks, stands or plays upon a railroad. It in terms precludes any recovery for damages due to injuries received under the conditions therein mentioned, and applies to all persons alike, without distinction as to their age or physical or mental condition." [29 N.J. at 248]
It is clear that under Egan it makes no difference whether one is on the tracks because of his physical or mental condition or because he deliberately went on the tracks.
Plaintiff urges on appeal that adoption of the Comparative Negligence Act, N.J.S.A. 2A:15-5.1 et seq., impliedly repealed N.J.S.A. 48:12-152.
Implied repealers are not favored in the law. In the absence of an express repealer, there must be a clear showing of legislative intent to effect a repeal. However, the doctrine is merely an aid in ascertaining legislative intent. A new law altering fundamental assumptions relied upon by the old law will work to supercede earlier inconsistent statutes. N.J. State P.B.A. v. Morristown, 65 N.J. 160, 164-165 (1974). When a later expression of legislative will is so clearly in conflict with an earlier statute on the same subject that the two cannot reasonably stand together, each in its own particular field, courts will find the legislative intent to supercede the earlier law. The test is whether the two statutes are inconsistent or repugnant. Brewer v. Porch, 53 N.J. 167, 173 (1969). The Comparative Negligence Act cannot be construed as a legislative intent to repeal N.J.S.A. 48:12-152 because earlier case law interpreting the railroad immunity statute clearly establishes that it was not based upon the law of contributory negligence then in existence, and thus a change in that law cannot be considered inconsistent or repugnant to the earlier statute.
*285 The railroad immunity statute has been uniformly interpreted to operate as an absolute bar to recovery for damages from a railroad for injuries unless willful or wanton conduct is shown. Potter v. Finch & Sons, 76 N.J. 499, 502 (1978). The statutory bar has been held to extend to infant trespassers as well as to adults even though they may have been of such tender years as to be incapable of contributory negligence. Erie R. Co. v. Duplak, 286 U.S. 440, 52 S.Ct. 610, 76 L.Ed. 1214 (1932); Erie R. Co. v. Hilt, 247 U.S. 97, 38 S.Ct. 435, 62 L.Ed. 1003 (1918); Kowaleski v. Pennsylvania R. Co., 103 F.2d 827 (3 Cir.1939), cert. den. 308 U.S. 556, 60 S.Ct. 95, 84 L.Ed. 467 (1939); Cohen v. Pennsylvania-Reading Seashore Lines, 58 F. Supp. 545 (E.D.Pa. 1944); Lissak v. Pennsylvania R. Co., 33 F. Supp. 214 (E.D.N.Y. 1940). In Egan v. Erie R. Co., supra, 29 N.J. 243, the court made it clear that whether a plaintiff is guilty of contributory negligence is irrelevant to applying the statutory bar. It reasoned that since the statute had adopted the common law policy in unqualified form that a landowner owed no duty to a trespasser other than to refrain from inflicting injury upon him through willful and wanton conduct, it is based upon the absence of the duty on the part of the landowner, and therefore it is unnecessary to consider the question of the trespasser's contributory negligence in the absence of the breach of any duty by the alleged tortfeasor. It concluded that the statute was enacted for the purpose of providing immunity from liability in those cases that come within the factual situation set forth, and the fact an infant trespasser could not be guilty of contributory negligence as a matter of law was irrelevant. Id. at 250-251.
Therefore, since the statute was never bottomed on or dependent upon the law of contributory negligence, a change in that law by virtue of the Comparative Negligence Act cannot be considered a change which is inconsistent or repugnant to the earlier statute so as to act as an implied repealer.
I agree that the trial court properly denied plaintiff's motion to strike the defense of contributory negligence. It is a general rule that those persons who know that their faculties are impaired *286 must conduct themselves as a reasonable person would in light of such disability. Berger v. Shapiro, 30 N.J. 89, 102 (1959); Karmazin v. Pennsylvania R.R., 82 N.J. Super. 123, 132 (App.Div. 1964). The issue of plaintiff's contributory negligence was predicated on resolution of whether he had conducted himself as a reasonable person would in light of his epilepsy. From the evidence presented there was a jury question whether plaintiff had been negligent. There was testimony that he had come to within several feet of the edge of the platform while walking and waiting for the train. Plaintiff testified that his epilepsy caused him on occasion to experience grand mal seizures which cause him to lose consciousness, fall down, and not remember what is happening. Also he had petit mal seizures on the average of once a week when he can usually talk, maintain his balance and know what is going on. The issue presented for the jury was whether knowing he had such a condition he acted negligently in walking as close as he did to the edge of the platform. Plaintiff asserts on appeal that the only conclusion available to explain his presence on the tracks was the onset of a grand mal seizure. However, it was a factual question for the jury to determine whether his actions preceding such seizure were unreasonable in light of his epileptic condition.
Plaintiff contends that the trial judge erred in restricting the use of answers to interrogatories. At the close of plaintiff's case he attempted to read into evidence certain interrogatories which had allegedly been secured from defendants. The trial judge permitted the introduction into evidence of seven questions and answers only against the corporation. He denied the introduction of the answers to interrogatories as against defendant Dorrman because he had made no certification as to the answers. What had occurred is that during discovery plaintiff propounded to both defendants, Conrail and Dorrman, certain interrogatories. Counsel for both defendants returned the answer to interrogatories with a notice that certifications would follow as the agent who prepared the answers to the interrogatories had neglected to sign them. Thereafter a signed certification *287 by an agent of Conrail was forwarded to plaintiff. However, at no time did defendant Dorrman certify the answers to these interrogatories. At trial, defense counsel objected to the introduction of the answers to interrogatories as to defendant Dorrman because they had only been answered by Conrail, and the judge upheld the objection.
R. 4:17-4(a) requires that answers to interrogatories be in writing under oath by the party upon whom served, if an individual, or by an officer or agent of a public or private corporation, partnership or association, or governmental agency. Therefore, the trial judge was correct to hold that the answers were admissible only as to Conrail and not as to Dorrman. While plaintiff may have assumed that the answers furnished were by both defendants, there being single counsel, he has failed on appeal to demonstrate any prejudice by the failure to admit these interrogatories into evidence as against defendant Dorrman. Portions of Dorrman's deposition were read to the jury. These portions did not differ substantially from the answers to interrogatories.
Plaintiff contends that the charge to the jury was erroneous. During the course of the trial judge's charge to the jury, he referred to plaintiff as a trespasser, and notwithstanding objection, failed to define trespasser or define or make reference to plaintiff as a possible invitee of the railroad. Plaintiff is suggesting that the facts presented allowed for a conclusion that he was a business invitee and not a trespasser on the railroad tracks, and thus the duty owed by Dorrman, the railroad engineer, would be different. However, plaintiff could not be considered anything but a trespasser on the tracks. It has frequently been held, including as to negligence of a railroad, that when a business invitee by his own volition exceeds the bounds of his invitation he loses his status as an invitee. Sullivan v. D., L. & W.R.R. Co., 105 N.J.L. 450, 454-455 (E. & A. 1928). Plaintiff evidently admits that his status on the tracks would be that of a trespasser except that he was upon the tracks *288 not by his own volition but because of his epileptic condition. However, plaintiff does not explain how the duty of care owed to him by a third party would change because his personal disability perhaps caused him to act involuntarily. Under the circumstances, it makes no difference how plaintiff came on the railroad tracks. His presence there could be found only to be as a trespasser in the absence of any proof that the railroad's negligence caused him to fall or become lodged on the tracks. The trial judge did not err in charging the jury or referring to plaintiff as a trespasser.
Plaintiff further contends that portions of the charge were confusing and conflicting. Considering the charge as a whole, the correct law was adequately conveyed for the factual circumstances presented. Latta v. Caulfield, 79 N.J. 128, 135 (1979). At issue was whether Dorrman, as the train engineer, had acted negligently in not sooner observing that the obstruction on the tracks was in fact a person and then trying to stop the train in time. At the end of the charge the trial judge instructed the jury:
Now, where a lookout is required in the case of an approach to a depot, a lookout shall everywhere be maintained with that degree of care which a person of ordinary prudence of caution, having in mind both the safety of the train and those it carries, the passengers, as well as persons likely to be on the track and injured by the train, would commonly exercise according to the circumstances, and the probabilities of danger at the portion of the track then being passed over. Such a lookout must be careful, diligent, effective, reasonable, proper, vigilant, and continuous.
When a person is discovered in a position of peril on or near the tracks, it is the duty of the railroad or its engineer to exercise due care to take proper precaution to avoid injury. It is not negligence on the part of the railroad operator or an engineer to fail to take precaution where it is impossible to do so after the person's peril has been discovered.
Put another way, where a person has been discovered in a position of peril on railroad tracks, the railroad operator must use all reasonable means at his command consistent with his duty to his own passengers to avert or avoid an accident. Evasive action need not be taken unless the circumstances of the case would lead a reasonably prudent man to believe that an object seen on the track was probably a human being.
It thus becomes here a question for you, the jury, to determine whether the engineer, having observed an object on the track, did exercise reasonable care in *289 running it down without first ascertaining whether it was, A, what it appeared to be, or whether it was, B, as it turned out to be, a human being.
The charge as a whole was sufficient. The jury was adequately instructed that the train engineer had to exercise reasonable care. It should be kept in mind that not only Dorrman but also the fireman thought that the article on the tracks was a large cardboard sign or cardboard box. In addition, a completely disinterested witness, Sister Gertrude Vincent, a passenger standing in the station, described the article on the tracks as looking like a piece of gift wrapping paper or gift box.
Plaintiff also contends that the trial judge erred in having portions of the testimony read to the jury in response to questions by the jury, without first giving the attorneys an opportunity to object or insist upon additional portions of the testimony being read. After his additional instructions to the jury the court allowed counsel to make objections, at which time plaintiff's counsel objected that the trial judge should have consulted the attorneys before responding to the jury's questions. While perhaps it would have been better if the trial judge had discussed the questions with counsel before giving the jury his response, it is fundamental that a party is not entitled to have the jury charged in words of his own choosing. It is sufficient if the instructions correctly state the principles of law pertinent to the issues. Kaplan v. Haines, 96 N.J. Super. 242, 251 (App.Div. 1967), aff'd o.b. 51 N.J. 404 (1968). There was no prejudicial error in the trial judge's handling of the questions of the jury.
The denial of plaintiff's motion for a new trial because the jury verdict was against the weight of the evidence was proper. A jury verdict will not be set aside unless it appears there was a manifest miscarriage of justice under the law. Carrino v. Novotny, 78 N.J. 355, 360 (1979). The overwhelming weight of the evidence showed Dorrman to have acted reasonably and prudently under the circumstances.
I would affirm the judgments of the trial court and the order denying the motion for a new trial.
NOTES
[1] Dorrman first testified that he performed those functions when approximately 300 feet from the "box-like object." On redirect he emphatically denied that he rang the bell until he was within "around 50 feet" of the "box-like figure."
[2] The other question was, "Does an error in judgment constitute negligence, or, in other words, if I make a decision and that decision proves to be wrong, does that in itself constitute negligence?"
[3] At the very commencement of his summation counsel for defendant reminded the jury of that which they already knew: "Now, at the outset, of course, there is one defendant remaining in this action, the engineer, Mr. Dorrman."